1998 ME 207

## In re ALEXANDER D. et al.

Supreme Judicial Court of Maine.

Submitted on Briefs June 10, 1998.

Decided Aug. 11, 1998.

---

Scott J. Lynch, Thomas P. Peters, II & Assoc., P.A., Lewiston, for appellant.

Andrew Ketterer, Attorney General, Janice S. Stuver, Aria eee, Asst. Attys. Gen., Augusta, for appellee.

Barbara Raimondi, Auburn, guardian ad Litem.

Donald S. Hornblower, Lewiston, for father.

Before WATHEN, C.J., and ROBERTS, CLIFFORD, RUDMAN, DANA and SAUFLEY, JJ.

CLIFFORD, Justice.

[¶ 1]  The mother of Alexander D. and Mason D. appeals from a judgment entered in the District Court (Lewiston, *Gorman, J.*) terminating her parental rights to those children, and from the court's denial of her motion to alter and amend the judgment. The mother contends: (1) that the court's refusal to hear her motion for judicial review prior to and separate from the hearing on the motion for termination violated her rights to due process;  (2) that the court erred in concluding that the circumstances relating to what the court found to be her inability to protect the children from jeopardy were unlikely to change within a time reasonably calculated to meet the children's needs; (3) that the court erred in finding that she is unable or unwilling to take responsibility for the children within a time reasonably calculated to meet their needs; (4) that the court penalized her for refusing to admit that she was the perpetrator of abuse on the children; and (5) that the court impermissibly ignored evidence demonstrating that she was caring for her recently born child without jeopardy to that child.  Finding no error or abuse of discretion, we affirm the judgment.

[¶ 2]  Alexander was born in January of 1988 and Mason in March of 1992.[1]  The evidence reflected that the children had suffered inadequately explained injuries.  In August 1994, the mother had taken Alexander to the hospital with a swollen right testicle and broken nose, injuries that were determined to be four days old.  In November 1994, Alexander was taken to the hospital for another nose injury, that the mother explained was caused by being hit by a ball. Alexander, however, did not say that he was hit by a ball.  In December 1994, Alexander was hospitalized for a laceration to the forehead, that the mother indicated (and Alexander reported to the treating doctor) occurred when he struck his head on a bookcase at school.  According to the school guidance counselor, however, no such injury occurred at school.

[¶ 3]  In February of 1995, Mason was hospitalized for a laceration to his forehead. The treating doctor found multiple bruises to his head, neck, stomach, penis, and buttocks, determined to have been "inflicted injuries." The mother indicated that the injuries were caused by Alexander hitting Mason in his sleep, and that the injuries occurred when she left them with Alexander's father while she was on a business trip.  Alexander's father, however, reported that there were no bruises when the mother picked the children up, and that he did not see them until the mother dropped Mason off at his house the next day.  He reported that, at the time, the mother made no accusation that he inflicted the injuries.

[¶ 4]  The court issued a preliminary protection order on February 9, 1995, placing the children in the custody of the Department.  On March 13, 1995, the court found there was evidence of severe abuse and injuries and that both parents blamed the other parent.  The court could not determine with any degree of certainty who was responsible for the injuries, but concluded that both parents failed to take necessary steps to protect their children from the abuse they had suffered.  One month after they were removed from their mother's care, the boys were placed in a foster home where, as of the time of the termination order, they had lived for thirty months.

[¶ 5]  In March and April of 1995, the mother, Alexander's father, and both children underwent psychological evaluations in the Child Abuse Program at the Spurwink Clinic to investigate the causes of injury to the children and to determine if either parent posed jeopardy to them.  The Spurwink report concluded:

> [the mother] is a woman with average estimated intellectual ability who has significant strengths in her functioning as a parent, despite her own history of dysfunctional, abusive, and neglectful family relationships as a child.  There is no doubt that she cares deeply about the welfare of her children and that she

---

1. Alexander's father was never married to the mother, nor did he live with her.  He consented to the termination of his parental rights.  The putative father of Mason apparently abandoned the child and did not participate in these proceedings.

wants them to have happy lives. The personality testing, however, provides a picture of a woman who on the one hand may appear quite competent in her social interactions, while on the other hand she may be an angry dependent individual who, though usually handling her anger in a depressive, passive-aggressive manner, at times may in fact lose control of her impulses and act out inappropriately. This tendency toward impulsivity when under stress is the primary finding pertinent to the question of whether she presents any risk to her children.

The psychological report· strongly recommended that the mother seek individual psychotherapy. Although it came to no definitive conclusion, the evaluation team as a whole, in its summary, stated that the mother was the more likely perpetrator of the injuries to Mason.

[¶ 6] After a hearing in September of 1995, the court entered a child protection order finding that the Department had made reasonable efforts to prevent the need to remove the children from the home, and that they were in circumstances of jeopardy. The mother was ordered to engage in substance abuse evaluation "and follow all recommendations," to engage in offenders counseling, and to engage in parent education.

[¶ 7] The extent to which the mother followed the September 1995 order was reviewed in hearings preceding the entry of an order in December 1996 that relieved the Department of its obligation to continue rehabilitation and reunification efforts with the mother, and that put the burden on her to make any further steps toward reunification.

[¶ 8] A substance abuse evaluation of the mother indicated no observable substance abuse problems, but did indicate a "risk of repeating Dysfunctional behavior" because of trauma she sustained as a child. The mother completed a parenting course in March of 1996, but had sporadic attendance and virtu-

ally no participation. Some of the professionals providing service to the mother concluded that she minimized her responsibility for injuries to the children, even if those injuries occurred while the children were not in her care. The guardian ad litem agreed with the Department's recommendation that reunification efforts cease, because of the length of time it was taking to create a permanent situation for the children. In relieving the Department of its obligation to continue reunification efforts, the court summarized the testimony:

> In virtually all of the long-term child protective cases which come through this court, one or both of the parents have some sort of mental or cognitive disability which prevents them from benefitting from services.... [T]he parents are simply not capable of acting as competent caretakers. In [the mother's] case, although the result may be the same, there is clearly no disability which prevents her from benefitting from services.... [She is] exactly the type of client every therapist hopes for— she is intelligent, articulate, and able to apply abstract theory to concrete examples. Yet this "perfect" client has done little except waste time for the last twenty-two months. Because of this waste, the boys are still in foster care, and their mother is not yet able to protect them.[2]

After the cease reunification order, in keeping with agency policy of moving toward termination of parental rights and permanence for the children, the Department decreased visits.

[¶ 9] The mother married in November 1996, and on March 8, 1997, had a son. On March 10, 1997, the mother, alleging that she had made substantial progress by participating in various programs, filed a motion for judicial review and to increase the contact she was allowed with Alexander and Mason.

---

2. The court did encourage the mother and urged her to continue to try to improve herself:

> While the Department will still have the obligation to provide for visits and pay for any services now in place, it will be up to [the mother] to make any further efforts toward reunification. Although this type of Order is usually a stepping stone to termination of parental rights, it is still possible for [the mother] to make the kind of progress we all expected when this case began almost two years ago. If she can do that, the court can always reinstitute reunification efforts.

Shortly thereafter, the Department filed a petition for termination of parental rights.

[¶ 10] A hearing was held on the mother's motion to increase visitation on June 26, 1997, but was not completed. The mother filed a motion to continue the previously scheduled hearing on termination of parental rights and requested an expedited completion of the hearing on her request to increase visitation. She opposed combining a hearing on termination of her parental rights with judicial review of her request for increased visitation. The court denied the mother's motion to sever the hearings, stating:

> These two boys came into [the State's] care on February 9th, 1995, when they were just seven and nearly three. Today is September 23rd, 1997. They are nine and a half and five and a half years old.... [S]ome of the delay in this case has been caused by the court's docket.... The ... issue of increased visitation is not one that could be based only on how much progress has or has not been made by [the mother].... I also have to take into consideration the children, their needs and their progress. And the two issues, ... are too identical and too pressing to allow either one of them to wait.

[¶ 11] A hearing on both the motion for judicial review (continued from June) and the petition for termination occurred on September 23–24, 1997. The court ordered the mother's parental rights to be terminated, and this appeal followed the denial of the mother's motion to alter and amend, filed shortly after the termination order was entered.

## I.

[¶ 12] The mother argues that the court's combining of the two hearings violated her right to due process. She contends that judicial review [3] of her motion for increased visitation should have been completed before the termination hearing.

A hearing on the visitation issue might have resulted in allowing her more visits, which, she argues, she could have used as evidence at a later termination hearing to substantiate the bond between her and the children. She contends that the process that was due to her was to "fairly allow the proponent of requested relief to present her evidence in full at a time when relief is available."

[¶ 13] When the state seeks to terminate the relationship between a parent and child, it must do so by fundamentally fair procedures that meet the requisites of due process. *In re Randy Scott B.*, 511 A.2d 450, 452 (Me.1986). Due process "is not a static concept; rather, its requirements vary to assure the basic fairness of each particular action according to its circumstances." *Id.* (quoting *In re Jo-Nell C.*, 493 A.2d 1053, 1055 (Me.1985)). The "fundamental requirement of due process is an opportunity to be heard upon such notice and proceedings as are adequate to safeguard the right which the particular pertinent constitutional provision purports to protect." *McNaughton v. Kelsey*, 1997 ME 182, ¶ 6, 698 A.2d 1049, 1052; *see also Sullivan v. Carignan*, 733 F.2d 8, 9 (1st Cir.1984) ("The essence of due process is that the party about to suffer a loss be given an opportunity to be heard 'at a meaningful time and in a meaningful manner.' "). In determining whether state action violates the due process clause, a court considers:

> (1) the private interest that will be affected by the government's action; (2) the risk of an erroneous deprivation of such an interest through the existing procedure and the probable utility of additional or substitute procedural safeguards; and (3) the government's interest in adhering to the existing procedure, including the fiscal and administrative burdens that additional procedures might entail.

*State v. Stade*, 683 A.2d 164, 166 (Me.1996).

[¶ 14] There is no dispute that the mother has a fundamental and "extremely impor-

---

3. Title 22 M.R.S.A. § 4038 (1992 & Supp.1997) provides that the child's parent may move for judicial review, *see* § 4038(2), and § 4038(5) further provides:

> 5. **Hearing.** The court shall hear evidence and shall consider the original reason for the adju-

dication and disposition under [the sections of the statute dealing with final protection orders], the events that have occurred since then and the efforts of the parties as set forth under section 4041 and shall consider the effect of a change in custody on the child.

tant" liberty interest in maintaining a familial relationship with her children. *In re Randy Scott B.*, 511 A.2d at 452. The court concluded, however, that the risk of erroneous deprivation of the mother's interest was equally balanced by the State's interest in "[p]romot[ing] the *early establishment of permanent plans* for the care and custody of children who can't be returned to their family.' " *In re Randy Scott B.*, 511 A.2d at 453 (emphasis added) (quoting 22 M.R.S.A. § 4003(4) (1992)). The court noted that it could not "make decisions based on judicial economy in the same way that [it] cannot make decisions based only upon the mother's wish.... [T]he two issues, the request ... by the Department for termination and the request by the parent for increased visitation are too identical and too pressing to allow either one of them to wait."

[¶ 15] The mother's engagement in court-ordered services had to be balanced against the Department's efforts to protect the best interest of the children, and to complete the children's transition into a permanent situation in a timely manner. The court recognized that over thirty months had passed since the children had come into the Department's care and that the delay was the partial fault of the crowded docket. It consciously combined the hearings, specifically noting that the mother's progress could not be evaluated without considering the children's needs. Further, the mother sought continuances in May and June of 1997, contributing to the delay. There was evidence to suggest that the next available block of time for a two-day hearing was in April of 1998, which would be a further delay of seven months, leaving the children in a state of limbo for well over three years. The September 1997 hearing dates allowed for a full airing of all of the issues, including those

brought forward by the mother, and with sufficient notice to all parties. The decision to combine the hearings was within the court's discretion, and not violative of the mother's rights to due process.

## II.

[¶ 16] The mother contends that the court erred in terminating her parental rights because the State did not meet its burden pursuant to 22 M.R.S.A. § 4055.[4] The court concluded that the mother had been unwilling or unable to take responsibility for Alexander and Mason within a time which is reasonably calculated to meet their needs, that her attempts to have the children returned to her created circumstances of jeopardy, that termination would be in their best interest, and that those circumstances were unlikely to change within a time reasonably calculated to meet their needs. 22 M.R.S.A. §§ 4055(1)(B)(2)(a), 4055(1)(B)(2)(b)(i)–(ii).

[¶ 17] Specifically, the mother asserts that as to her failure to take responsibility for the children and to protect them from jeopardy, the court had no evidence with which to make its findings that the circumstances were unlikely to change and that she could not take responsibility for the children within a time which is reasonably calculated to meet the children's needs. Although the court noted the progress that had been made by the mother in rehabilitating herself, it concluded:

[The mother] did participate [in Department Services], but her efforts have been less than ideal. In addition, the combination of her denial of involvement, her minimization of the damage done to her children while in her care, and her underlying psychological problems have prevented her

---

4. Section 4055 provides in relevant part:
  **1. Grounds.** The court may order termination of parental rights if:
  . . .
    (2) The court finds, based on clear and convincing evidence, that:
      (a) Termination is in the best interest of the child; and
      (b) Either:
      (i) The parent is unwilling or unable to protect the child from jeopardy and these circumstances

are unlikely to change within a time which is reasonably calculated to meet the child's needs;
  (ii) The parent has been unwilling or unable to take responsibility for the child within a time which is reasonably calculated to meet the child's needs;
  (iii) The child has been abandoned; or
  (iv) The parent has failed to make a good faith effort to rehabilitate and reunify with the child pursuant to section 4041.
22 M.R.S.A. § 4055 (1992 & Supp.1996).

from working effectively towards reunification. Even if the court were to assume that [she] will continue to make the kind of progress she has recently made, she has at least another ... year of treatment in front of her. These children cannot wait another year.[5]

■ [¶ 18] Unlike many cases involving termination of parental rights, the mother points to the substantial progress she has made in taking advantage of the remedial services available to her. In analyzing the parent's alleged inability to protect or inability to take responsibility for a child, however, "[t]ime is measured from the child's perspective" in determining whether the responsibilities can be met or the circumstances of jeopardy are likely to change within a time which is reasonably calculated to meet the child's needs. *In re Leona T.*, 609 A.2d 1157, 1159 (Me.1992). Moreover, we recently have rejected a contention from parents that, when assessing parental fitness, the court should look only at parents' actions *after* issuing a child protection order, not those over the entire course of the child protection proceedings. *See In re Nathaniel B.*, 1998 ME 99, ¶ 5, 710 A.2d 921, 922:

> [W]hile the inquiry concerning parental unfitness ... concerning the parents' inability or unwillingness to protect the children from jeopardy and to take responsibility for the children, is prospective, the evidence to be considered is retrospective. *In re Leona T.*, 609 A.2d 1157, 1159 (Me. 1992). As to ... the parents' failure to rehabilitate and reunify, its plain meaning

requires the court to undertake a retrospective analysis. There is nothing in the statute, and nothing in our past decisions, that limits the temporal scope of the court's examination of evidence to any particular period.

*Id.* at ¶ 7. The court's decision to weigh the mother's inability to protect her children and her poor participation in various programs along with her recent improved participation was perfectly proper.

[¶ 19] The court considered the substantial evidence that the children, because of the harm suffered while in the mother's custody, and the length of time they had been in the stable environment of foster care, would be placed in jeopardy if removed from foster care. Indeed, it is appropriate for a court to make "a finding of jeopardy when a child, already vulnerable from earlier abuse and instability, face[s] 'developmental regression of serious magnitude' if removed from his stable foster home." *In re Colby E.*, 669 A.2d 151, 152 (Me.1995) (quoting *In re Dean A.*, 491 A.2d 572, 573 (Me.1985)); *cf. In re Annette P.*, 589 A.2d 924, 927 (Me.1991) ("A [jeopardy] finding adverse to a parent is especially well founded if ... the child needs the stability of a long-term foster home to overcome the emotional impact of chronic medical problems.").

[¶ 20] In this case, the guardian ad litem's report furnished persuasive support for the prospect that removal of the children from their foster home would place them in jeopardy.[6] Viewed properly from the per-

---

5. The mother also contends there is no evidence to show that she requires an additional year of treatment. Based on all the evidence, the court could rationally conclude that it would take a substantial period of time for the mother to be ready to take responsibility for her two sons.

6. The guardian's report summarized:

. . . .

I continue to be concerned that [the mother], because of her horrendous personal history does have those "trap doors," that are wont to fly open unexpectedly under some triggering stress. This is a source of potential jeopardy for children in her care. The court proceedings have been a goad to [the mother] to get help, but it is significant that [she] actually had to be at the point of losing her children before she could even be

motivated to act. One cannot help but be convinced that the trauma that [she] has suffered must have left its mark. It seems unlikely that seven (7) or eight (8) months of therapy have "cured" the conditions that led to these children coming into care.

. . . .

It would take some time to get through this reunification process, perhaps a year or longer. The children would have to deal with the trauma of separating from a place in which they are secure, happy and content, try to form a trusting relationship with their mother, try and recreate a bond with their mother, try and create a bond with a stranger ([mother's] new husband) and creating a bond with their new stepbrother.... They would need to deal with a number of losses, not only the loss of their relationship with their foster parents, but physical relocation of both

spective of the child, *see In re Colby E.*, 669 A.2d at 152, the court's findings that the circumstances of the mother's inability to protect the children from jeopardy were unlikely to change within a time reasonably calculated to meet the needs of the children, and that the mother is unable to take responsibility for the children within a time reasonably calculated to meet the needs of the children, are not clearly erroneous. *In re David G.*, 659 A.2d 859, 861 (Me.1995) ("Any of the four alternatives [in § 4055] is adequate to justify termination if supported by clear and convincing evidence.") (citation omitted).

### III.

[¶ 21] The mother also contends that the court penalized her for not admitting that she physically abused the children. The contention is without merit. In its decision to terminate, the court's emphasis was on the mother's overall deficiencies as a caregiver. Although she has admitted to not being careful enough about where her children were cared for, the mother did not fully accept responsibility for the children's well being, a legitimate consideration for the court in its decision to terminate.

### IV.

[¶ 22] The mother also contends that the court failed to properly consider the fact that she was adequately caring for her newborn child.[7] A child protection petition concerning that child has been dismissed and she argues that "it is impossible to find that jeopardy exists with respect to other children, while at the same time concluding that

it does not exist with respect to a child of tender years residing in the same household."

[¶ 23] The court rejected the mother's argument that "jeopardy is a family-based issue, rather than a child specific issue," concluding:

> In reaching the conclusion that [the mother] had been unwilling or unable to take responsibility ..., the court was not considering the needs of *any* children. It was considering the needs of *these* children.... It is encouraging to learn that the other protective case involving [the mother] has been dismissed, but that case has never had a bearing on this one.

[¶ 24] Title 22 M.R.S.A. § 4055(1) requires that the court take into consideration the needs of the child, meaning the child who is the subject of the proceedings. Although the record reflects that the court did adequately consider the weight to attach to evidence about the mother's care of her new baby, the court declined to base its findings as to the mother's ability to protect from jeopardy, or to take responsibility for Alexander and Mason, solely on her ability to care for her younger child.

The entry is:

Judgment affirmed.

---

home and school. There is the risk that these two (2) bright, verbal and active children may not integrate well into [the mother's] new family and might upset the careful balance of her household. There is no question but that it would insert a huge amount of stress in [the mother's] life and that, with (3) children in her household, she would be extremely lucky indeed to have time to attend to her own personal and psychological needs.

7. The mother raised this issue in her motion to alter and amend the judgment terminating her parental rights.