1999 ME 191

### In re BREAUNA N.

Supreme Judicial Court of Maine.

Submitted on Briefs Oct. 14, 1999.

Decided Dec. 20, 1999.

---

James S. Hewes, Caroline J. Gardiner, Portland, for appellants.

Andrew Ketterer, Attorney General, Michael C. Kearney, Asst. Attorney General, Augusta, for appellee.

Kevin F. Gordon, Pierce Atwood, Portland, Guardian ad Litem.

Anne C. Pomroy, Old Orchard Beach, for intervenors.

Edmund R. Folsom, Portland, for father.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

RUDMAN, J.

[¶ 1] Breauna's mother and her grandfather appeal from an order entered by the District Court (Portland, *Bradley, J.*) terminating the mother's parental rights pursuant to 22 M.R.S.A. §§ 4055(B)(2)(a), 4055(B)(2)(b)(i), and 4055(B)(2)(b)(ii) (1992 & Supp.1998). They argue that the court erred when it found by clear and convincing evidence: (1) that the mother was unwilling and unable to take responsibility for and protect Breauna from jeopardy in a time reasonably calculated to meet Breauna's needs; and (2) that the termination of her parental rights was in Breauna's best interest. The mother further asserts that the court erred when it denied her motion to reinstate the Department of Human Services' (DHS) obligation to reunify her with Breauna. The mother and the grandfather also contend that the

court erroneously determined (1) that DHS made a good faith attempt to reunify Breauna with her mother and grandfather; and (2) that equitable estoppel did not preclude a finding that the mother made insufficient efforts to reunify with Breauna. Finally, the grandfather argues that the court exceeded the bounds of its discretion when it excluded his letter from evidence. We disagree and affirm.

## I. FACTS

[¶ 2] Based upon the unified record, the trial court could have found the following: The fifteen-year-old mother delivered Breauna on February 9, 1995. Breauna's grandfather traveled to Maine from the U.S. Air Force Base in Aviano, Italy to help his daughter for a week. After the grandfather returned to Italy, he sent money and necessities for Breauna. As an infant, Breauna had numerous medical problems. Breauna was born with a ventricular septal defect in her heart; she also had multiple ear and urinary tract infections. Her mother repeatedly sought medical help for the child, but the child's illnesses persisted. Between November 1995 and February 1996, Casey Family Services, which provided intensive in-home treatment, a public health nurse, and a day care center assisted the mother in caring for Breauna.

[¶ 3] When DHS first petitioned for a Child Protection Order (CPO), it argued that the mother jeopardized Breauna's health and welfare. At thirteen months old, Breauna only weighed fifteen pounds, four ounces. DHS did not initially seek custody of Breauna. Rather, DHS referred the mother and Breauna to the Spurwink Clinic for comprehensive psychological and medical evaluations. A Spurwink doctor diagnosed Breauna's condition as non-organic failure to thrive due to environmental conditions.

[¶ 4] After the Spurwink evaluations, DHS sought a preliminary CPO. The court awarded DHS temporary custody of Breauna because her mother needed extensive parenting training and assistance. DHS placed Breauna with a foster family and the mother moved to Aviano, Italy with her family.

[¶ 5] At the final CPO hearing, the court (Portland, *Beaudoin, J.*) found by a preponderance that Breauna was in jeopardy because she suffered from non-organic failure to thrive. The mother did not sufficiently feed, nurture or interact with Breauna. The court concluded that Breauna was in an immediate risk of serious harm due to caloric deprivation, a condition that could result in permanent brain damage and serious developmental delays.

### A. Reunification Efforts With Breauna's Grandfather

[¶ 6] In October 1996, the court (Portland, *Goranites, J.*) granted Breauna's maternal grandfather limited intervenor status pursuant to 22 M.R.S.A. § 4005–B (1992). In March 1997, the court (Portland, *Foster, J.*) ordered DHS to reunify Breauna with her grandfather overseas. The first step in reunifying Breauna with her grandfather was a home study. The home study was delayed by over a year. The grandfather and his family were living on the U.S. Air Force Base in Germany. The grandfather recommended a person to complete the home study in Germany to DHS, but DHS declined his suggestion. About a year later, DHS hired the same person to complete the home study that the grandfather had identified. This delay adversely affected the grandfather's reunification with Breauna because DHS credited Breauna's attachment to her foster family during that year as a reason for maintaining her foster care.

[¶ 7] The court ordered the grandfather to temporarily relocate to Portland to begin an intensive reunification with Breauna. Breauna's placement with her grandfather and his wife was contingent upon her successful transition to them. When the court ordered reunification with the grandfather, it simultaneously relieved

DHS of its obligation to reunify Breauna with her parents.

[¶ 8] Spurwink recommended that the reunification plan exclude the mother because it feared that the grandfather would give her physical custody of Breauna. Rosemary Merrill, Breauna's guardian *ad litem* (GAL) until March 1998, was concerned that Spurwink had based its recommendation on misinformation because the grandfather and his wife were "adamant" that they—not the mother—would be Breauna's primary caretakers. Ms. Merrill thought the misinformation influenced Spurwink's final recommendation.

[¶ 9] In February 1998, the intensive reunification of the grandfather and Breauna began. Spurwink Clinic designed and executed the reunification plan. Before the intensive reunification plan was established, the grandfather informed DHS and Spurwink that he could only remain in Maine for thirty days because Air Force rules prohibited him from living off base for more than thirty days.[1]

[¶ 10] Spurwink's plan allowed the grandfather to visit Breauna under supervision for two hours, twice a week. The record shows that this plan was not a traditional intensive reunification plan. The plan should have consisted of at least four visits a week building towards daily visits. Although Spurwink knew the grandfather only had thirty days in the United States, its reunification plan required sixty days. The grandfather returned to Germany less than thirty days into the reunification program.

[¶ 11] The grandfather can no longer be considered a reasonable alternative for custody. He has not returned to Maine since he left in March 1998 and he has not attended any of the termination hearings. At the termination hearing, the grandfather's attorney offered a letter from the grandfather. The attorney offered the letter during the examination of the mother under M.R. Evid. 801(d)(2), but the court excluded the letter because it did not fall within any hearsay exception.

### B. Efforts of the Mother

[¶ 12] While in Germany, the mother received her general education diploma. She took college courses and worked at a steady job. She also completed a parenting course at the military base. The mother decided, in Spring 1998, to begin the process of reunifying with Breauna. The mother arrived in Portland in August 1998. She obtained a full-time job and an apartment. At the time of the termination hearing, the mother was attending parenting classes and counselling at the YMCA.

[¶ 13] The GAL commended the mother for the progress that she had made: "She appears to be a totally different person than the person described in the reports from when Breauna first came into care." The mother is "articulate, reasonably mature, somewhat naïve and intelligent." A doctor at Spurwink, however, described the mother as a rigid and defensive person. She does not suffer from any personality disorders.

[¶ 14] The GAL questioned the mother's commitment to rearing Breauna because the mother had minimal contact with her. While living in Europe, the mother visited Breauna in July and October 1996, when she saw her child three times; in April and August 1997, when she visited Breauna almost daily between April 5, and April 12; and in January 1998. The court held the first day of the termination hearing in September 1998 and the next two days of the hearing in November 1998. Between the September and November termination hearings, the mother only visited Breauna twice. Although the mother left about twenty-five messages for the foster mother to set up visits with Breauna between Sep-

---

1. The grandfather had retired from his position with the Air Force, but his wife was still a member of the Air Force, and as her spouse, he was required to follow the regulation. Otherwise, they would lose their cost of living allowance.

tember and November 1998, the foster mother failed to return her calls.

[¶ 15] The mother testified that she was not ready to assume custody of Breauna. She could not estimate when she would be ready. She also acknowledged that Breauna received excellent care from her foster mother.

### C. Breauna

[¶ 16] Breauna has lived with the same foster family since DHS took custody. Her foster parents provide an excellent home life where Breauna is flourishing. Breauna calls her foster mother "Mom." Breauna, now four and a half years old, has spent two-thirds of her life with this family that hopes to adopt her.

[¶ 17] When DHS placed Breauna with her foster family, Breauna suffered from serious medical conditions. Her health has stabilized, but her social, perceptual and motor skill developments are still delayed. She wears orthotics for support in her shoes and attends occupational therapy.

[¶ 18] Breauna is emotionally fragile. Breauna's most significant attachment is to her foster mother. Both the Spurwink team and the GAL testified that separating Breauna from her foster family would be detrimental to her developmentally, socially and emotionally. If the mother were to reunify with Breauna, it would be a long and arduous process that would require continuous monitoring and support.

## II. DISCUSSION

### A. Sufficiency of the Evidence

[¶ 19] Contrary to the mother's contentions, sufficient evidence exists on the record to support the court's factual findings by clear and convincing evidence. When reviewing sufficiency challenges for clear and convincing evidence, we examine whether the trial court "could have reasonably been persuaded on the basis of evidence in the record that the required factual findings were 'highly probable.'" *In re Denise M.,* 670 A.2d 390, 393 (Me. 1996).[2] The record supports the finding that the mother was unable and unwilling to take responsibility for and protect Breauna from jeopardy within a time reasonably calculated to meet her needs.[3] When determining a parent's willingness and ability to take responsibility for and protect her child, we measure time from the child's perspective. *See In re Alexander D.,* 1998 ME 207, ¶ 18, 716 A.2d 222, 228. Breauna has been in DHS custody for over three years, yet her mother, by her own admission, is still not ready to take custody of Breauna and cannot estimate when she will be ready to take custody. The mother has maintained minimal contact with Breauna. During the three years that Breauna has been in DHS custody, the mother has visited Breauna sporadically.

[¶ 20] Clear and convincing evidence also establishes that termination was in Breauna's best interest. *See In re Denise,* 670 A.2d at 393. Breauna is thriving in her foster home. She has developed a strong emotional bond with her foster mother. Removing Breauna from the stable environment of her foster family would damage her social, emotional and physical development. By her own admission, Breauna's mother is not ready to care for Breauna in the manner that Breauna re-

---

2. We stress that our task as an appellate court is to determine whether the record supports the trial court's findings. Thus, we do not independently examine the conduct of DHS. *See In re David H.,* 637 A.2d 1173, 1176 (Me.1994) (affirming termination of parental rights because record supported court's factual findings, "independent of any findings as to the conduct of DHS.")

3. Section 4055 only requires that the record support a finding that the mother was unwilling *or* unable to either take responsibility for *or* protect her child from jeopardy. *See* 22 M.R.S.A. § 4055 (1992 & Supp.1998). In this case, the trial court found—and the record supports—that the mother was both unwilling *and* unable to take responsibility for *and* protect her child from jeopardy.

quires. Breauna has spent over three years of her young life living with her foster family while seeing her biological family about twice a year. Breauna needs stability in her life and, therefore, it is in her best interest to remain with her foster family where she has that stability. The foregoing facts support the District Court's findings by clear and convincing evidence.

### B. Good Faith Effort to Reunify

[¶ 21] The mother and the grandfather also assert that DHS failed to execute its statutory obligation of making a good faith effort to reunify Breauna with her biological family. See 22 M.R.S.A. § 4041 (1996 & Supp.1998). We disagree. The evidence in the record establishes by a preponderance that DHS acted in good faith. See In re Denise, 670 A.2d at 394 (opining that good faith action by DHS must be proved by a preponderance of the evidence). Before DHS petitioned to remove Breauna from her mother's custody, the mother had the assistance of Casey Family Services, a day care center, and a public health nurse. When DHS took custody of Breauna, the mother moved to Europe. The mother was not available to undergo the extensive parenting instruction that she needed to safely care for Breauna. DHS attempted to reunify Breauna with her grandfather, but the reunification effort failed.

[¶ 22] In *In re Denise*, we opined that DHS satisfied its statutory obligation because it spent two years trying to help the parents learn parenting skills, even though DHS failed to disclose that one of its counselor's who recommended termination also wanted to adopt the child. *See In re Denise*, 670 A.2d at 393–94. Similar to the circumstances in *In re Denise*, DHS spent over three years trying to reunify Breauna with her family. *See id.* DHS did not address this matter as efficiently as it should have, but DHS did not cause the mother to move to Europe and live a great distance from her daughter. DHS

did not cause the grandfather to leave the intensive reunification early. Thus, DHS's efforts to establish and implement a reunification program support the finding that DHS engaged in a good faith reunification effort. *See In re Denise*, 670 A.2d at 394.

### C. Equitable Estoppel

[¶ 23] The mother asserts that the doctrine of equitable estoppel bars DHS from using her failure to reunify with Breauna as evidence that termination is in Breauna's best interests. Equitable estoppel only applies when a party relies to her detriment on another party's misleading conduct. *See Anderson v. Comm'r of Dep't of Human Servs.*, 489 A.2d 1094, 1099 (Me.1985). When the Court relieved DHS of its obligation to reunify the mother with Breauna, the mother knew that the reunification of Breauna and her grandfather was contingent upon the successful completion of the intensive program. When reunification with the grandfather failed, the mother allowed four months to pass before she commenced efforts to reunify with her daughter. DHS did not engage in misleading conduct that would induce the mother to rely to her detriment and, thus, the doctrine of equitable estoppel does not apply.

### D. Grandfather's Letter

[¶ 24] The grandfather contends that the court exceeded the bounds of its discretion when it excluded his letter from evidence at the termination hearing. *See Kay v. Hanover Ins. Co.*, 677 A.2d 556, 558 (Me.1996) (opining that the court applies clear error and abuse of discretion to the trial court's evidentiary rulings). The grandfather's attorney offered a letter written by the grandfather—a party who was not present at the hearing—during examination of the mother. The grandfather argues that the letter was not hearsay because he offered the letter under M.R.

Evid. 801(d)(2).[4] M.R. Evid. 801(d)(2) only applies to statements offered against a party-opponent. M.R. Evid. 801(d)(2). The grandfather's letter was not offered by a party-opponent. He offered his own letter. The court, therefore, properly excluded the letter.

The entry is:

Judgment affirmed.

SAUFLEY, J., files concurring opinion with whom, DANA and CALKINS, JJ., join.

SAUFLEY, J., with whom, DANA and CALKINS, JJ., join, concurring.

[¶ 25] I concur with the result in this case because the District Court's findings are supported in the record, *see In re Denise M.*, 670 A.2d 390, 393 (Me.1996), because it is clear that Breauna has developed an attachment to her foster family which if broken, would actually cause her harm, *see In re Ashley A.*, 679 A.2d 86, 89 (Me.1996), and because Breauna's mother unfortunately delayed too long in getting her own life together sufficiently to provide a safe home for Breauna, *see In re Serena C.*, 650 A.2d 1343, 1344–45 (Me. 1994).

[¶ 26] I write separately, however, to address the egregious delays that occurred during this troubling process. The system failed this little girl and her family. Because of this failure, Breauna will be deprived of a life with the family that wanted her. This simply should not have occurred.

[¶ 27] In order to understand my concerns, a more detailed history of the process is necessary. In the midst of a troubled adolescence, Breauna's mother left home when she was fourteen years old. On February 9, 1995, at the age of fifteen, she gave birth to Breauna, a child with multiple health problems. She lived briefly with the child's father. Her own father, a serviceman then stationed in Italy, flew to Maine to be with his daughter after she gave birth and later suggested that his daughter and Breauna come back to live with him. She declined his invitation. Breauna's health failed during her first year of life, and the Department took custody from the overwhelmed teenage mother in March of 1996, just a few weeks after Breauna's first birthday. There is little doubt that the Department's initial action in taking Breauna into its care was both necessary and appropriate.

[¶ 28] Breauna's grandfather, who had already demonstrated his concern for his granddaughter by coming personally to Maine at the time of her birth and by supporting his daughter financially, made his interest known to the Department immediately after Breauna was placed in the Department's custody and offered to take custody from the Department. He filed a formal motion to intervene in April of 1996 and participated consistently, either personally or through counsel, in the proceedings. By September of 1996, the guardian ad litem had gathered a significant amount of information regarding Breauna's grandfather and recommended that the court consider transferring responsibility for Breauna to her grandfather.

[¶ 29] Department policy apparently requires that a home study be performed to gather the information necessary for the Department and the court to make an informed determination about the appropriateness of a placement with a relative. The Department therefore required the grandfather to submit to a home study of his new residence in Germany. To this end, the grandfather researched the matter and quickly located an individual quali-

---

4. The grandfather also asserts that the letter was admissible under M.R. Evid. 803(3). The grandfather is precluded from raising the issue under M.R. Evid. 803(3) because it was not offered pursuant to 803(3) in the trial court. *See Davis v. Picciandra,* 662 A.2d 898, 899 (Me.1995) (refusing to address an argument because appellant failed to properly preserve the issue by not raising it before the trial court).

fied to perform the DHS mandated home study.

[¶ 30] The Department was apparently unwilling or unable to expeditiously confirm the credentials of the person suggested for the job by the grandfather, and instead chose to search independently for a professional to perform the study. Without any clear reason, it took the Department one full year merely to begin the process of the home study by locating a suitable person. Ironically, the person chosen was the person suggested by the grandfather a year previously. The reason for the year long delay is never made clear in the record. To her credit, the caseworker testified straight forwardly that "It's a very lengthy process. It's a lot of paperwork. It's a lot of shuffling. *And there is no other excuse,* other than it's a long, lengthy process."

[¶ 31] That "long, lengthy process" resulted in the passage of a full year in Breauna's life without movement toward a placement with her family.[5] Even after the completion of the home study, quite favorable to the grandfather, the Department took no action to move toward a family placement. As the guardian ad litem stated in a report dated September 16, 1997:

> [I]t does appear that we have placed [the grandparents] in an extremely difficult position by delaying the Home Study and then penalizing them for that delay by using Breauna's attachment to [her foster mother] as one of the reasons for maintaining the foster placement for one year.[6]

The guardian also recommended that Breauna have "a period of daily unsupervised contact" with her grandparents. Notwithstanding this recommendation, it took a request for hearing from the grandfather to bring the matter to the court's attention. Fully six months after the initial recommendation, the court forced the Department to undertake reunification plans.

[¶ 32] At that hearing, the court (*Goranites, J.*) appropriately required an immediate and "intensive" reunification plan for the placement of Breauna with her grandfather. Unfortunately, by the time that plan was implemented in February of 1998 Breauna was three years old. She had been in the Department's custody for exactly two years and was attached to her foster mother. The experts retained to draw up the intensive plan structured an eight-week introduction, during which Breauna and her grandfather would have two, two-hour supervised visits each week. Because of Breauna's age, attachments, and fragility, the process was necessarily slow. The grandfather, who had informed the reunification team that he was unable to remain in Maine for longer than four weeks, became frustrated with the entire process and eventually abandoned efforts to cooperate with the Department. Breauna's mother, with whom the Department had temporarily suspended reunification efforts in order to concentrate on the grandfather, returned to Maine in August of 1998 to attempt reunification herself. Two weeks later, the Department filed a petition to terminate her parental rights.

[¶ 33] In termination of parental rights cases, the timeframe must be "measured from the child's perspective." *In re Leona T.,* 609 A.2d 1157, 1159 (Me.1992). A one-year delay can be a lifetime from an infant's perspective. In this case, two years passed between the time the Department took Breauna into its care and the implementation of the intensive reunification plan. No child or family should have to wait that long simply because of a process

---

5. During this time the grandfather made efforts *to maintain contact with Breauna.* He flew back to Maine to visit Breauna in October of 1996, April and August of 1997, and January, February and March of 1998.

6. *See In re Justin T.,* 640 A.2d 737, 739 (Me. 1994) (cautioning courts not to use the fact that the Department has restricted the relationship of a parent and a child as evidence that termination is in the child's best interest).

that is "a lot of paperwork ... a lot of shuffling."

[¶ 34] The Legislature recently responded to concerns about delays in permanency planning for children in foster care with the enactment of a comprehensive bill intended to assure more speedy resolutions for such children. *See* P.L.1997, ch. 715, § B–14. Particularly recognizing the harm that can be done to a child who has no permanent home, the Legislature mandated that, except in unusual circumstances, the Department move to terminate the parental rights of any child who has been in the Department's care for "15 out of the most recent 22 months." 22 M.R.S.A. § 4052(2–A)(A) (Supp.1998).[7] Here, Breauna had been in care for 24 months before the Department made an effort to place her with her grandfather. It comes as no surprise that the effort would prove nearly impossible for out-of-state relatives after such a lengthy passage of time.

[¶ 35] I do not question the Department's responsibility to assure that a prospective placement with a child's relatives will be a safe and loving placement.[8] The process of gathering that information, however, should be done expeditiously. Whether the delay was caused by the Department of Human Services in Maine, other components of the international child placement bureaucracy, or a combination of both,[9] the delay proved fatal to the final efforts to place Breauna with her grandfather.

[¶ 36] To date, Breauna has spent over three and one-half years with the same foster family—nearly eighty per cent of her young life. Her mother's inexperience and departure from the country as soon as Breauna was taken into custody combined to create a situation where she cannot now step back into Breauna's life. There is little doubt that Breauna has grown attached to her foster family and that removing her from their care at this late date could be devastating. We simply cannot turn back the clock for Breauna.

[¶ 37] However, as the Department attempts to comply with the mandates created by the recent actions of the Legislature, all persons involved with child protective proceedings must attend to the child's needs with much greater speed. Without such efforts by all involved, the loss of a family, sadly suffered by Breauna, may be repeated. Accordingly, I concur that the District Court's decision is supported by the record, but I would urge that all involved work to assure that what happened to this family does not occur again.

---

7. This provision is one of many required to be in place in any state receiving federal payments for foster care and adoption assistance. *See* 42 U.S.C. § 671(16), § 675(5)(E) (1994 & Supp.1997).

8. The Department did not act unreasonably in declining to turn Breauna over to her grandfather without first assuring that she would be safely cared for in his home. Once a child is actually in the legal custody of the Department, certain requirements must be met before the child may be placed with a relative. *See* 22 M.R.S.A. § 4005–B(4) (1992 & Supp.

1998). Nor do I question the need for the Department to assure that the home offered by Breauna's grandfather was a safe, loving home and one that did not contain the parenting deficits Breauna had experienced in her mother's care.

9. There are significant restrictions on the Department's freedom to place a child in its custody in the home of any person not living in Maine. *See, e.g., The Interstate Compact on Placement of Children,* 22 M.R.S.A. § 4191–4297 (1992).