1999 ME 195

**In re KAFIA M.**

Supreme Judicial Court of Maine.

Argued Dec. 6, 1999.
Decided Dec. 23, 1999.

---

Jane Elizabeth Lee, (orally), Diane Powers, (orally), Portland, for appellants.

Andrew Ketterer, Attorney General, Michael C. Kearney, Asst. Attorney General (orally), Augusta, Ellyn C. Ballou, (orally), South Freeport, (for intervenors) for appellees.

Judith Plano, South Portland, for Guardian ad Litem.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

CALKINS, J.

[¶ 1] The parents of Kafia M. appeal the judgment of the District Court (Portland, *Eggert, J.*) terminating their parental rights. The father, Mohamed I., argues that the evidence was insufficient to support a termination of parental rights. The mother, Shamso H., argues that her due process and equal protection rights were violated because she was not provided an interpreter when the child protection proceeding was initiated. Both parents argue that their due process rights were violated because they were not appointed separate counsel for the jeopardy phase of the case. We affirm the judgment.

## I. PROCEDURAL HISTORY

[¶ 2] The District Court (*Beaudoin, J.*) issued a temporary child protection order on March 11, 1996 awarding temporary custody of Kafia, then two months old, to the Department of Human Services (DHS). By order dated March 18, 1996, Kafia's parents were found indigent, and the court appointed an attorney to represent them in the proceedings. A hearing on the child protection petition was held on March 26, 1996, and, by agreement of the parties, the court (*MacNichol, J.*) granted the petition and awarded custody of Kafia to DHS. In its order after review, effective May 7, 1996, and by the agreement of the parties, the court (*Bradley, J.*) ordered that Kafia remain in DHS custody but set out a detailed visitation schedule for the parents. The order also included the statement that the parties expected that Kafia would be placed with her parents as soon as it was safe to do so. Kafia was placed with her parents on May 20, 1996, but on June 27, 1996, she was removed by

DHS and returned to the same foster family with whom she had resided previously. After the next review in October 1996, the court (*Cote, J.*) found that Kafia should stay in DHS custody and that reunification efforts should continue.

[¶ 3] Additional review hearings were held in January and April 1997, and it was ordered that Kafia remain in DHS custody and that reunification efforts continue. By order dated September 18, 1997, the parents were appointed separate counsel to represent them. DHS petitioned for termination of parental rights on February 6, 1998. After two continuances, the termination hearing took place over seven days in December 1998 and January 1999. The District Court issued detailed findings of fact and terminated the parental rights of both parents. The court also denied the parents' motions to dismiss.[1] After the parents filed timely appeals, the court granted intervenor status to Kafia's foster parents.

## II. FACTS

[¶ 4] The parents of Kafia were born in Somalia. At the time of the termination hearing Shamso was 33 years old and Mohamed was 40 years old. When war broke out in Somalia in 1991, they left the country. They met in a refugee camp in Kenya. Mohamed had been married twice before. His first wife died leaving him with two children, and his second wife abandoned him and their six children during the journey from Somalia into Kenya. Mohamed and Shamso married in 1995, and one child was born to them in Kenya. They immigrated to Maine through the assistance of a refugee agency. The twins, Kafia and Libon, were born in Portland in January 1996. Kafia was very small and had to remain in the hospital for three weeks, but Libon was big enough to go home with his parents.

[¶ 5] When a home health nurse visited the home of Mohamed and Shamso on March 6, 1996, she observed Kafia whimpering in her crib. The nurse noticed that one of Kafia's legs appeared to be broken. She instructed the parents to take Kafia to the hospital. The radiologist found that Kafia had three fractures of her leg bones. Mohamed could not explain the injuries except to say that Shamso had been massaging Kafia's legs to ensure that her legs were straight. According to Mohamed, his native culture values straight legs. Additionally, Kafia had fingernail scratches, bruising, a frenulum tear and lip injuries. The medical personnel concluded that the injuries were nonaccidental and that Kafia was a victim of child abuse.

[¶ 6] Upon obtaining the child protection order, DHS placed Kafia with the intervenors who remained her foster parents throughout the time she was in the custody of DHS. Mohamed and Shamso received extensive services from DHS in an attempt to allow Kafia's return to their home. Nurses visited with the family to deal with health issues and provided parenting guidance. Other agencies provided assistance on resettlement and cultural issues as well as parenting support. DHS returned Kafia to Mohamed and Shamso on May 20, 1996, for a trial placement. During this time numerous care providers visited the home to assist the family and ensure the safety of Kafia. Although providers noticed minor injuries on Kafia in June, they thought that the injuries could have been self-inflicted.

[¶ 7] On June 27, 1996, a DHS caseworker and a refugee settlement worker were called to Kafia's home by Mohamed following an altercation between the parents that began when Shamso threw a

---

1. At the close of the evidence, the parents moved to dismiss on the grounds that DHS was required to obtain a cease reunification order before it could file the termination petition and that DHS was required to place the child with a foster family with the same cultural and religious background as the natural parents. The motions to dismiss were denied, and the parents did not appeal the denial.

glass of milk at Mohamed. DHS decided to remove Kafia from the home at least temporarily. Kafia was returned to the foster parents who became concerned about her physical condition and took her to a doctor. X-rays and bone scans of Kafia revealed multiple fractures in the clavicle, left femur, and five ribs, all of which had occurred during the five weeks that Kafia was at the home of Mohamed and Shamso. Neither parent had any explanation for these new injuries. Kafia also showed significant regression from her previous development. She was no longer able to push up with her hands when she was lying on her stomach and no longer able to hold a bottle or sit without support. Within a short time of being placed back into the foster parents' home, Kafia progressed rapidly, gaining weight and reaching appropriate developmental milestones.

[¶ 8]  After Kafia's removal from Shamso and Mohamed, they visited weekly with her, together at first and later separately. After Kafia started talking, she began to protest going to the visits. Shamso and Mohamed moved into separate living quarters in 1997 because there was not enough room for them and all of the children in one apartment and because Shamso was having some difficulties getting along with her stepchildren. Mohamed's children from his previous marriages reside with him, while three children born to Shamso and Mohamed live with Shamso, including a baby born in December 1996. The apartments of Mohamed and Shamso are in the same housing complex and only a few feet apart.

### III.  SUFFICIENCY OF THE EVIDENCE

[¶ 9]  In order for parental rights to be terminated DHS must prove, by clear and convincing evidence, one of four possible statutory bases, in addition to proving that termination is in the best interest of the child. *See* 22 M.R.S.A. § 4055(1)(B)(2) (1992). The trial court found that DHS proved three statutory bases: (1) Mohamed and Shamso are unwilling or unable to protect Kafia from jeopardy and these circumstances are unlikely to change within a time reasonably calculated to meet her needs; (2) they are unwilling or unable to take responsibility for her within a time reasonably calculated to meet her needs; and (3) they failed to make a good faith effort to rehabilitate and reunify with Kafia. *See* § 4055(1)(B)(2)(b)(i), (ii), (iv). The court also found that termination was in Kafia's best interest. *See* § 4055(1)(B)(2)(a). Mohamed argues that the evidence was insufficient for the court to make these findings by clear and convincing evidence. For this challenge, we examine whether the trial court "reasonably could have been persuaded on the basis of evidence on the record that the required factual findings were 'highly probable.'" *In re Denise M.,* 670 A.2d 390, 393 (Me.1996) (quoting *In re David H.,* 637 A.2d 1173, 1175 (Me.1994)).

[¶ 10]  Although the trial court found three bases for the termination, only one basis is necessary. Because we conclude that there is sufficient evidence that Mohamed is unable to protect Kafia from jeopardy and that this situation is unlikely to change within a time reasonably calculated to meet her needs, we do not address the sufficiency of the evidence on the other two bases.[2]

[¶ 11]  Dr. Lawrence Ricci, Director of the Spurwink Child Abuse Program, and Dr. Kerry Drach, a psychologist with Spurwink, testified at the parental rights termination hearing. Dr. Ricci examined Kafia on March 6, 1996, while she was in the hospital. He also reviewed the x-rays taken after she was returned to the foster

---

**2.**  Shamso has not argued that the evidence is insufficient as to her. Our review of the record persuades us that the trial court had more than sufficient evidence to meet the standards of termination as to Shamso.

parents in June. He met the parents to explain Kafia's injuries to them. The trial court made the following findings:

> The evidence is overwhelming and uncontroverted that Kafia sustained multiple and serious fractures in the care of her parents, Mohamed [ ] and Shamso [ ]. Dr. Lawrence Ricci testified that Kafia suffered from Battered Child Syndrome, which is defined as multiple non-accidental injuries to multiple systems. Furthermore, Kafia's injuries were not due to metabolic bone disease or osteogenesis imperfecta. Dr. Ricci opined that the force required to cause any of Kafia's ten fractures would be so excessive as to alert any reasonable person that Kafia was being physically harmed. More distressing, if Kafia continued to be exposed to the level of force which caused her multiple fractures, the result could be lethal. Dr. Ricci testified that placing Kafia with her parents with no explanation for the injuries would subject Kafia to extreme risk. Also, even though the other children in the home appear to be healthy, Dr. Ricci testified that physical abuse is often directed at only one child.

> The Court finds Dr. Ricci's testimony uncontroverted and convincing. Kafia, for whatever reason, is not safe with Shamso [ ] or Mohamed [ ]. When Kafia lived with her parents, she was seriously injured. Since she has been in foster care, she has thrived. Kafia's injuries while in the care of her parents were either caused by one or both of her parents, or at the very minimum, by her parents' gross failure to protect Kafia from physical abuse perpetrated by a third party. The fact that Kafia was so seriously injured on several occasions during an extremely supported and monitored trial placement vividly demonstrates that Kafia can not live with Mohamed [ ] or Shamso [ ] under any circumstances.

■ [¶ 12] The compelling and uncontroverted evidence from Dr. Ricci justifies the trial court's finding that Mohamed was unable in the past to protect Kafia from jeopardy. As Mohamed argues, the issue is not only whether Mohamed was able to protect Kafia previously, but also whether he is currently able to protect Kafia and, if not, whether that circumstance is likely to change within the time reasonably calculated to meet her needs. *See In re Howard P.*, 562 A.2d 1224, 1227 (Me.1989). While our inquiry as to ability to protect from jeopardy is prospective, the evidence we consider is retrospective. *See In re Nathaniel B.*, 1998 ME 99, ¶ 6, 710 A.2d 921, 922.

[¶ 13] In addition to the evidence of the serious injuries, the court had before it sufficient evidence to support its conclusion that it is highly likely the situation would not change within the time reasonably calculated to meet Kafia's needs. Dr. Drach led a team that performed psychological evaluations of both Mohamed and Shamso in the summer of 1997. The evaluations were designed to take account of the cultural differences between the United States and Somalia. Dr. Drach also watched both parents and the foster parents interact with Kafia. In its findings, the trial court quoted extensively from Dr. Drach's report which was also signed by Dr. Ricci. With regard to Mohamed, the report stated that he has "an extremely rigid, inflexible personality pattern." The examiners found that Mohamed is "a difficult, litigious, demanding man with whom community professionals have experienced significant difficulty establishing working relationships." The report classified Mohamed as suffering from a personality disorder. The court further quoted the following conclusion from the report: "[Mohamed's] style of interacting deviates significantly from the norm, cannot be explained simply as culturally conditioned, and is a significant factor that is preventing satisfactory solution of the current child protective problem situation." The court concurred in the re-

port's conclusion that "[l]ack of minimal observable change would indicate poor prognosis for positive improvement." The court noted that during the evaluation process Mohamed did not take responsibility for Kafia's injuries and on another occasion he blamed the DHS caseworker and Maine Medical Center for causing Kafia's injuries.

[¶ 14] The fact that Mohamed was unable to protect Kafia from serious injury when she was two months old and again unable to protect her from serious injury when she was five months old allows a factfinder to conclude that it is highly unlikely that he will be able to protect her from serious injury when she is two years old. There is still no explanation for how the injuries came about, whether they were inflicted by Mohamed, Shamso, one of the children living in the household, or some other person. The lack of explanation does not bode well for ensuring that Mohamed can take steps to prevent similar injuries in the future. His personality disorder, lack of cooperation with the service providers, denial for a long period of time of any responsibility for Kafia's injuries, combined with the seriousness of the injuries and the extraordinary efforts by DHS to reunite the family, all provide support for the court's conclusion that Mohamed is unable to protect Kafia from jeopardy and this circumstance is not likely to change in a time reasonably calculated to meet Kafia's needs.

[¶ 15] On the issue of the length of time within which a parent should be expected to obtain the ability to protect the child, we measure time from the child's perspective, *see In re Christopher J.,* 505 A.2d 795, 797–98 (Me.1986). For all children, permanency and stability are legislatively mandated goals, and the impermanency of foster care is to be avoided. *See* 22 M.R.S.A. § 4050 (1992). From the evi-

dence presented at the hearing the court could have concluded that Mohamed's inability to protect Kafia was a circumstance not likely to change for an indefinite period of time and the child should not be made to wait indefinitely in the impermanence of foster care.

[¶ 16] The evidence also demonstrates a high probability that termination is in Kafia's best interest. The trial court expressly considered the statutory factors, that is, Kafia's age; her attachment to the foster parents and lack of attachment to Mohamed and Shamso; her integration in the foster parent household; and her physical and mental needs. *See* 22 M.R.S.A. § 4055(2) (Supp.1999). She is bonded with the foster parents who want to adopt her, but not bonded to either her mother or father, although she showed more attachment to Mohamed than to Shamso. When she was placed with the foster family in late June 1996, she was sad, woke up screaming in the night, and was developmentally delayed. She improved rapidly, met the developmental milestones, and regained a sense of humor. She does not like visiting either Shamso or Mohamed and needs sustained support from the foster parents before and after the visits. The trial court found that she is thriving in the foster family household.

[¶ 17] The court recognized that Kafia was born to a Muslim family and that the foster family is not Muslim. In the best of all possible worlds there would have been a Muslim foster family to care for Kafia during the entire time she has been in foster care. *See* 22 M.R.S.A. § 4063 (1992).[3] During the proceedings, however, no Muslim family came forward to be Kafia's foster family and no Muslim family was suggested by the parents. The lack of a Muslim foster family does not change the best interest analysis. Al-

---

**3.** Section 4063 states:
If the parents of a child in the custody of the department request in writing that the child be placed in a family of the same

general religious faith, for foster care or adoption, the department shall do so when a suitable family of that faith can be found.

though the trial court appropriately considered Kafia's heritage, on these facts the court was not compelled to find the lack of a Muslim foster family to be a determinative factor.

## IV. THE LACK OF AN INTERPRETER AT THE EARLY STAGES OF THE CHILD PROTECTION PROCEEDING

[¶ 18] The facts found by the trial court with regard to the abilities of Shamso and Mohamed to speak English and the provision of interpreter services are as follows and are supported by the record. Shamso's English is poor, but Mohamed speaks excellent English. When the child protection proceedings were started in March 1996, Shamso refused the services of an interpreter at the hospital. Several of the service providers testified that they were able to communicate with Shamso either through hands-on demonstrations or through Mohamed. They were confident that Shamso understood because of her responses.

[¶ 19] Shamso was provided an interpreter throughout the termination hearing. In fact, three Somali language interpreters were sworn at the beginning of the hearing. Evidence was presented that Shamso requested an interpreter in the summer of 1996, but the specific interpreter she requested was not available, and it was not until October 1996 that DHS obtained the services of an interpreter for her. An interpreter was present throughout the Spurwink evaluation.

[¶ 20] Shamso argues that the failure of DHS to provide a Somali-language interpreter at all stages of the child protection process is a violation of her rights to due process and equal protection as secured by the Fourteenth Amendment to the United States Constitution.[4] She contends that having an interpreter at the termination hearing itself is not sufficient because the termination hearing was preceded by almost two years of various contacts with DHS personnel. She argues that she did not have a meaningful opportunity to be heard during those other contacts.

[¶ 21] The standard due process analysis enunciated in *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) requires a balancing of three factors. *See In re Charles Jason R., Jr.*, 572 A.2d 1080, 1081 (Me.1990) *and In re Randy Scott B.*, 511 A.2d 450, 452–54 (Me.1986) (applying *Mathews* to due process challenges to portions of child protection and parental rights termination statutes and proceedings). The first factor is the private interest affected by the government, *Mathews*, 424 U.S. at 335, 96 S.Ct. 893, and there is no question that Shamso's interest in her parental rights is a substantial one, *see In re Alexander D.*, 1998 ME 207, ¶ 14, 716 A.2d 222, 226–27. The second factor is the "risk of an erroneous deprivation." *Mathews*, 424 U.S. at 335, 96 S.Ct. 893. Shamso argues that there was a substantial risk that her parental rights in Kafia would be terminated erroneously because of the lack of an interpreter at the early stage of the proceed-

---

4. Maine also guarantees by statute and rule a litigant's right to an interpreter:

    When personal or property interest of a person who does not speak English is the subject of a proceeding before an agency or a court, the presiding officer of the proceeding shall either appoint a qualified interpreter or utilize a professional telephone-based interpretation service. Payment by the State for an interpreter in civil matters is within the discretion of the agency or court to the extent that payment by the State is not already required by law.

5 M.R.S.A. § 51 (Pamph.1999).

M.R. Civ. P. 43(*l*) provides:

    The court may appoint a disinterested interpreter of its own selection, including an interpreter for the deaf, and may fix the interpreter's reasonable compensation. The compensation shall be paid out of funds provided by law or by one or more of the parties as the court may direct, and may be taxed ultimately as costs, in the discretion of the court. Interpreters shall be appropriately sworn.

ings. We disagree. The provision of an interpreter at the termination hearing itself alleviated any risk of an erroneous termination that might have been engendered by the lack of an interpreter at an earlier point. Shamso was able to raise at the termination hearing, through her attorney and an interpreter, issues as to any misunderstandings that may have developed early in the process from the lack of a neutral interpreter. Furthermore, at a key point between the jeopardy and termination hearings, that is, the psychological evaluation and meetings with Drs. Drach and Ricci, Shamso also had an interpreter.

[¶ 22] The third factor in *Mathews* is the government's interest in adhering to the existing procedure, including the fiscal and administrative implications of additional procedures. *See id.* Presumably there would be a financial impact upon DHS if it were required to provide an interpreter at every interaction with Shamso. Such an impact would be worthwhile if an interpreter was necessary to communicate with Shamso, but the facts found by the trial court were that the providers and DHS workers were able to communicate with Shamso by demonstrations or through interpretation provided by Mohamed. By the time Shamso and Mohamed began living apart, a separate interpreter was provided for her. Before that time it was not unreasonable to expect Mohamed, whose interests appeared to be the same as Shamso's, to interpret. Weighing the *Mathews* factors, we find no deprivation of Shamso's due process rights.

[¶ 23] Shamso's equal protection argument fails as well for the reason that the trial court found that she was able to communicate with DHS workers before an interpreter was provided and because an interpreter was provided for her at the crucial stages of the termination process.

## V. THE FAILURE TO ASSIGN SEPARATE ATTORNEYS TO THE PARENTS AT THE EARLY STAGES OF THE CHILD PROTECTION PROCEEDING

[¶ 24] Mohamed and Shamso assert that their due process rights were violated because the District Court failed to assign separate counsel to them at the inception of the child protection proceedings in 1996.[5] They now claim that there was a conflict of interest between them and that the court should have recognized the conflict and ordered individual representation.[6] The record does not reflect a request for separate counsel until September 1997, when the attorney originally assigned to represent Shamso and Mohamed moved to withdraw from representation. The motion was granted, and Shamso and Mohamed were each appointed an attorney.

[¶ 25] Mohamed and Shamso have been represented by their separate attorneys since September 1997, more than one full year before the termination hearing. Because the parents have not demonstrated that they had a conflict of interest at a time when they were both represented by the same attorney, we do not need to determine whether and when separate counsel should have been appointed. The appointment of separate counsel when first requested and the representation by separate counsel at the termination hearing ameliorates any defi-

---

5. In *Danforth v. State Dept. of Health and Welfare,* 303 A.2d 794 (Me.1973), we held that the due process clause requires the appointment of counsel to indigent parents faced with the termination of their parental rights. The requirement of appointed counsel has been embodied in the child protection statutes. *See* 22 M.R.S.A. § 4005(2) (1992).

6. The parents claim that the conflict is the result of a dispute as to the cause of Kafia's injuries and from Mohamed's early suggestion that Shamso's massaging of Kafia's legs might have led to the fractures. It is not clear, however, that there has ever been a conflict of interest between the two parents. At the termination hearing, neither blamed the other for Kafia's injuries. Both said they did not know how Kafia's injuries occurred.

ciency that might have resulted from the appointment of only one attorney to represent them at the jeopardy proceeding. At the termination hearing the parties could have raised any issue that resulted from their lack of separate counsel. In fact, they did not raise, at the termination hearing, the issue of lack of separate counsel.

[¶ 26] The parents point to *In re Christopher C.*, 499 A.2d 163 (Me.1985), in which we held the failure of the court to appoint counsel for a mother for the preliminary protection hearing required vacation of the final child protection order. The mother and father were separated, contemplating divorce, and the father was seeking custody of the children. *Id.* at 164. Their interests were adverse to one another. The trial court had not allowed the mother to examine witnesses at the preliminary hearing. *Id.* Some of the witnesses who testified at the preliminary hearing were not reexamined at the final hearing and only asked to swear that their previous testimony was true. *Id.* Therefore, while the mother had an attorney at the final child protection hearing, the attorney was unable to fully represent her. *Id.* at 164–65. The attorney, although agreeing to let the court consider the evidence presented at the earlier hearing, had not even heard that evidence. *Id.*

[¶ 27] In contrast, at the termination hearing regarding Mohamed and Shamso's parental rights, the court did not rely upon evidence taken at prior hearings. Evidence was fully presented on Kafia's injuries, the removal from her home, the trial placement, the additional injuries, the numerous services provided to the family, the medical and psychological data, and the current situation of Kafia, in addition to the numerous witnesses presented by the parents as to their standing in the community, their characters and reputations, their ability to parent, and the observations of neighbors and friends.

[¶ 28] Furthermore, Mohamed and Shamso have failed to demonstrate any prejudice that resulted to either of them by being represented for a time by the same attorney. In his brief, Mohamed argues that if he had had his own attorney before DHS petitioned for termination of his parental rights, he could have sought to obtain custody of Kafia. The fact is he had his own attorney for several months before the petition for termination was filed. The lack of separate counsel at the jeopardy stage of the child protection proceedings did not result in a denial of due process to them in the termination phase of the case.

The entry is:

Judgment affirmed.

