2001 ME 105

**In re ANNIE A.**

Supreme Judicial Court of Maine.

Argued: May 17, 2001.
Decided: July 13, 2001.

AL., PROSSER AND KEETON ON THE LAW OF TORTS § 87 at 624–25 (5th ed.1984).

Joyce Mykleby, Esq., (orally), Machias, for appellant.

G. Steven Rowe, Attorney General, John H. Hawkes, Asst. Attorney General (orally), Matthew Pollack, Asst. Attorney General, Augusta, for appellee.

Frederick Stocking, Esq., Lamoine, Guardian ad Litem.

Carol Lewis, Esq., Lubec, for intervenors.

Panel: WATHEN, C.J., and RUDMAN, CLIFFORD, DANA,* SAUFLEY, ALEXANDER, and CALKINS, JJ.

ALEXANDER, J.

[¶ 1] The mother of Annie A. appeals from a judgment of the District Court (Machias, *Romei, J.*) terminating her parental rights in her daughter. The mother contends that the court erred when it (1) found by clear and convincing evidence that she was unable to take responsibility for Annie within a time which was reasonably calculated to meet Annie's needs, and (2) failed to accord Annie's maternal grandparents priority consideration for Annie's placement. We affirm the judgment.

## I. CASE HISTORY

[¶ 2] The factual history of the case must be examined with acknowledgement of a statutory mandate that gives grandparents priority for consideration for placement *if* that placement is in the best interests of the child. The relevant statute provides:

> In any proceeding when standing and intervenor status have been granted, the grandparent may request the court to order that the child be placed with the grandparent. In making a decision on the request, the court shall give the grandparents priority for consideration for placement if that placement is in the best interests of the child and consistent with the purposes listed in section 4003.

22 M.R.S.A. § 4005-B(4) (Supp.2000). The record supports the following facts:

[¶ 3] Annie was born on September 1, 1999, and was immediately removed from her mother's care. On September 3, pursuant to a preliminary child protection order obtained by the Maine Department of Human Services (DHS), Annie was placed in a foster home. Shortly thereafter, the court conducted a summary preliminary hearing on the protection order. *See* 22 M.R.S.A. § 4034(4) (Supp.2000). At the hearing, a DHS caseworker testified that Annie would be in jeopardy if she was returned to her mother because Annie's father had an extensive history of substance abuse and domestic violence. After the hearing, the court ordered that Annie remain in DHS custody because of her father's behavior and her mother's minimization of that behavior and the threat it posed to Annie. The court also stated that the mother lacked "sufficient intellectual capacity to be the primary caretaker of an infant."[1]

[¶ 4] Beginning in November 1999, the mother was allowed to visit Annie at her foster home under the foster mother's supervision. The visits lasted three to four hours per day and occurred five days per week. In addition, Annie's mother attended weekly counseling sessions with a licensed clinical social worker, and partici-

---

* Although not available at oral argument, Justice Dana participated in this opinion. *See* M.R.App. P. 12(a) (stating that a "qualified justice may participate in a decision even though not present at oral argument").

1. After the hearing, the mother and DHS, agreed that the mother should be placed in St. Andre's home in Bangor so she could learn basic parenting skills in a supervised setting, St. Andre's rejected the placement, however, as the mother, at age 27, exceeded its age limit.

pated in a parenting capacity evaluation conducted by a clinical psychologist.

[¶ 5] In early January 2000, the court received a report from Annie's guardian ad litem. The guardian's report noted that Annie's mother had suggested that the mother's father and stepmother, who reside in Belleville, Michigan, would be an appropriate placement for Annie. The grandparents later testified that they each had contacted a person at DHS in the fall of 1999 and attempted to arrange visits with Annie around Christmas or on weekends, but were refused because at the time they had no legal standing.

[¶ 6] The court conducted a jeopardy hearing on January 10, 2000. *See* 22 M.R.S.A. § 4035(1) (Supp.2000). On January 18, authorities found Annie's father's body in a snowbank. He had died from exposure while stranded during a snowstorm. Apparently no party advised the court of this significant change of circumstances between the January 10 jeopardy hearing and the later jeopardy order.

[¶ 7] In its jeopardy order, the court determined that Annie should remain in DHS custody at her foster home. The court found that circumstances of jeopardy existed due to "a serious threat of emotional abuse, physical abuse and neglect" because of the father's violent personality and substance abuse problem, and the mother's failure to recognize the threats Annie's father's behavior posed to herself and Annie. In addition, the court ordered DHS to initiate a home study of Annie's Michigan grandparents for potential placement and custody of Annie with a relative in the event that reunification with the mother failed. *See* 22 M.R.S.A. § 4191 (1992).

[¶ 8] Between the January 10 jeopardy hearing and the July 10 contested judicial review, reunification efforts continued as the mother maintained her supervised visits with Annie [2] and attended her weekly therapy sessions. Near the end of January, a DHS caseworker contacted the grandparents, and the grandparents expressed their interest in gaining placement of Annie. Shortly thereafter, the grandparents filed a motion for, and were granted, intervenor status. *See* 22 M.R.S.A. § 4005–B(2) & (3) (Supp.2000).

[¶ 9] At the beginning of the July 10 contested judicial review, both the mother's counsel and the court expressed disappointment because the grandparents' home study had, not yet been received. Counsel requested a continuance until its receipt. DHS opposed the continuance, and the court denied the request. The home study had been completed on June 17 and mailed from Michigan on or after July 1. It is not clear when DHS received it. A cover page indicates that DHS had the study in its possession on or before July 13. Thus, DHS may have received the home study between July 10 and July 13.

[¶ 10] During the July 10 hearing, the mother's therapist testified that the grandfather has had little involvement in his daughter's life and that the grandfather was reluctant to address or identify her intellectual limitations. Following the hearing, the court issued an order allowing DHS to cease its reunification efforts. In its order, the court discussed the importance of bonding and the great extent to which Annie had already bonded with her foster parents. The court also noted that despite her diligent efforts, Annie's mother never will have the capacity to protect Annie or appreciate her special needs. Finally, the court stated that the grandfather

---

2. The length and location of the supervised visits were reduced and changed after the mother took some money from the foster mother's purse.

has never been a significant part of his own daughter's life, and that it would "not lightly transfer custody to someone who has not been a part of—a significant part of Annie's life, if any part at all, but has been really a rather insignificant part of [the mother's] life ...."[3]

[¶ 11] The Michigan home study indicated that Annie's grandparents currently have two young children of their own. The home study characterized the grandparents' marital relationship as "stable, respectable, and loving," and noted that they "were very supportive of each other and anxious to adopt Annie." The study concluded "that the [grandparents'] home is an extremely loving home capable of nurturing and raising another child," and that although Annie's grandfather "feels badly that Annie cannot be raised by her mother, he has accepted [the mother's] limited abilities and is prepared to raise his granddaughter." The home study ultimately approved Annie's placement with the grandparents.

[¶ 12] DHS filed a petition to terminate the mother's parental rights on August 2, and the court conducted a termination hearing on September 25. At the hearing, a DHS caseworker testified that Annie had significantly bonded with her foster mother and that she did not believe Annie's placement in the grandparents' home was in Annie's best interests. The caseworker also stated her concern that placement in the grandparents' home was really a situation designed to allow the mother to raise Annie. On cross-examination, the caseworker admitted that Annie's mother had done everything she could to comply with reunification and had been diligent in her efforts, but had made only minimal improvements in several areas. The caseworker also testified that her plan from the beginning was to support Annie's placement with the foster parents in the event that reunification with her mother failed.[4]

[¶ 13] The grandmother testified that she first had contact with DHS in December 1999. She stated that she talked to a DHS worker on the telephone for about thirty minutes, and that she told the worker that she and her husband would never permit Annie's mother to move to Michigan to raise Annie.

[¶ 14] Once they were granted intervenor status, the grandmother testified she and Annie's grandfather were told they would be allowed one visit per month with Annie. The visits were to last only one hour, and had to be scheduled between Monday and Friday. *Cf.* 22 M.R.S.A. § 4005–B(6) (Supp.2000). Annie's grandmother explained that if there had been some flexibility allowing a longer weekend visit, it probably would have made a difference in terms of their coming from Michigan to Maine for a visit. The grandmother testified that it was difficult to come to Maine during the week for a one hour visit because it was a twenty hour drive, she worked full-time, it was expensive, and they had two young children. The grandmother also stated that DHS told her that "it was in Annie's best interest if [she and

---

**3.** In his report, the guardian ad litem stated that he was opposed to Annie's placement with the grandparents "even if the home study report of the [grandparents'] home is favorable."

**4.** The following colloquy between the grandparents' counsel and the caseworker occurred on cross-examination:

Q: So from the beginning it has been your plan that if it did not work with [Annie's mother] that this family would be able—
A: Absolutely.
Q: —to adopt this child?
A: Yes.

her husband] stayed out of Annie's life and basically just let the State take care of it."

[¶ 15] Annie's grandfather testified that he told Annie's mother she would not be permitted to come to Michigan to raise Annie, and that Annie's mother understood that the grandparents would be Annie's parents. The grandfather further stated that he recognized that Annie's mother has limited intellectual ability, but that he did not want "people—outsiders—telling me my child has a—is limited." On cross-examination, the grandfather admitted that he knew Annie had been in foster care since September 1999, but that he did not come to Maine to see her until one supervised visit in August 2000. He explained that he was raising his two children and that he was "getting the run-around" from DHS.

[¶ 16] Following the termination hearing, the court entered a judgment terminating the mother's parental rights in Annie finding, by clear and convincing evidence, that (1) termination was in Annie's best interests; (2) her mother was unable to protect Annie from jeopardy and the circumstances were unlikely to change within a time which was reasonably calculated to meet Annie's needs; and (3) the mother was unable to take responsibility for Annie within a time which was reasonably calculated to meet Annie's needs.

[¶ 17] The court noted that "[Annie's mother] has been regular in her visits and she loves Annie [but] regrettably, however, given her intellectual limitations, she will never be able to keep Annie safe or be able to meet her emotional or developmental needs." The court further noted that "Annie, by all reports, is a happy and healthy child with some developmental delays. She has been in her present foster home since birth and she's closely bonded to her foster parents. Her foster parents are sensitive to her delays and have shown the ability to put services in place for her."[5] Finally, the court concluded that the grandparents are "good people," but their lack of insight into Annie's developmental needs, the grandfather's inability to acknowledge Annie's mother's developmental delays, and the significant bonding that had occurred between Annie and her foster family, established that it was in Annie's best interests to remain at her foster home. The court then adopted DHS's permanency plan and ordered that Annie remain with her foster parents. Annie's mother brought this appeal. The grandparents did not appeal.

## II. DISCUSSION

### A. Termination of Parental Rights

[¶ 18] A court may terminate parental rights if the parent is unable to protect the child from jeopardy or to take responsibility for the child within a time which is reasonably calculated to meet the child's needs, and if termination is in the best interests of the child. 22 M.R.S.A. § 4055(1)(B)(2)(a) and (b)(i-ii) (1992 & Supp.2000). The court can terminate parental rights only if it finds, by clear and convincing evidence, that these elements have been satisfied. 22 M.R.S.A. § 4055(1)(B)(2).

[¶ 19] "When reviewing sufficiency challenges for clear and convincing evidence, we examine whether the trial court could have reasonably been persuaded on the basis of evidence in the record that the required factual findings were highly probable." *In re Charles G.*, 2001 ME 3, ¶ 5, 763 A.2d 1163, 1165–66 (citation omitted).

---

5. The testimony of several witnesses establishes that Annie has some form of developmental delay. The severity of the delay is not clear from the record.

Therefore, if "'rational or competent support in the record'" exists for the District Court's findings, we must sustain them. *Id.* ¶ 5, 763 A.2d at 1166 (quoting *In re David G.*, 659 A.2d 859, 861 (Me.1995)).

[¶ 20] Proof of any one of the four statutory definitions of parental unfitness, pursuant to 22 M.R.S.A. § 4055, is independently adequate to justify termination if supported by clear and convincing evidence and a separate finding that termination is in the child's best interests. *Id.* ¶ 6, 763 A.2d at 1166. In this case, although it needed to find only one, the trial court determined that DHS proved two of the parental unfitness grounds by clear and convincing evidence. *See id. See also In re Kafia M.*, 1999 ME 195, ¶ 10, 742 A.2d 919, 923. Specifically, the trial court found that (1) Annie's mother was unable to protect Annie from jeopardy and the circumstances were unlikely to change within a time which was reasonably calculated to meet Annie's needs, *see* 22 M.R.S.A. § 4055(1)(B)(2)(b)(i); and (2) Annie's mother was unable to take responsibility for Annie within a time which was reasonably calculated to meet Annie's needs. 22 M.R.S.A. § 4055(1)(B)(2)(b)(ii).

[¶ 21] The evidence is sufficient to support the court's findings of parental unfitness and best interests. The evidence demonstrates that DHS made significant efforts to promote reunification with the mother by providing counseling, frequent visitation, and parenting skills education. *See* 22 M.R.S.A. § 4041 (1992 & Supp. 2000). Although there is no dispute that Annie's mother loves her daughter very much, has made every effort through counseling and visitation to learn effective parenting skills, and has been cooperative and diligent in her attempt to gain the skills necessary to be a competent parent for Annie, the court could conclude that the mother's limited cognitive skills have placed a barrier on her ability to retain and generalize information. The evidence supports the conclusion that the mother lacks the cognitive ability to learn, retain, and apply basic parenting skills such as washing baby bottles, holding a baby safely, and protecting a baby or toddler from everyday household dangers. Accordingly, because the evidence establishes that it is highly probable that the mother will always remain unable to independently take responsibility for Annie, the evidence is sufficient to support the trial court's findings supporting termination.

## B. Grandparent Placement

[¶ 22] The grandparents did not appeal the court's placement decision. Annie's mother, however, raises the issue because Annie's placement with the foster parents assuredly deprives the mother of any contact with her daughter. Conversely, placement with the grandparents may provide a situation within which the mother could maintain some level of meaningful contact with Annie. Accordingly, although the grandparents are not parties to the appeal, we consider the issue properly before us on the basis of the mother's appeal and her direct and substantial interest in maintaining contact with her daughter within her family structure.

[¶ 23] As noted in the case history, section 4005–B(4) requires that intervening grandparents be accorded priority status for placement consideration if such placement is in the grandchild's best interests. There is no dispute, nor could there be on this record, that the grandparents were not accorded priority status pursuant to the statute. The record establishes that DHS, from the beginning, intended the foster parents to serve as the adoptive family of Annie in the event that reunification with her mother failed. DHS, the guardian ad litem, and the foster parents

were consistently opposed to the possibility of Annie's placement with the grandparents. The court was persuaded by such opposition.

[¶ 24] In its order terminating parental rights and awarding placement to the foster parents, the court found that the grandparents were "good people" but addressed neither the information in the home study nor the grandparents' testimony at the hearing. Thus, the grandparents received no priority consideration.

[¶ 25] However, the Legislature has directed that a favorable "best interest" determination is a prerequisite to giving grandparents priority consideration for placement. Thus, section 4005–B(4) directs that grandparents shall receive priority consideration for placement only "if that placement is in the best interests of the child and consistent with the purposes listed in section 4003."

■ [¶ 26] In this case, Annie's placement with the grandparents would be consistent with the purposes of the Act.[6] In addition, placement with the grandparents promotes the goal of family reunification. *See* 22 M.R.S.A. § 4003(3).[7] In allowing the grandparents to intervene, the court must have found that (1) the grandparents had made sufficient effort to establish a relationship with Annie; (2) granting intervenor status was in Annie's best interests; and (3) the grant of intervenor status was consistent with the purposes of the Act. *See* 22 M.R.S.A. § 4005–B(3).[8] Those findings standing alone, however, do not compel a finding that placement with the intervening grandparents is in the child's best interests.

■■ [¶ 27] In the context of a termination hearing, the trial court determines the best interests of the child by relying on such factors as "the needs of the child, including in its analysis, the child's age, the child's attachment to relevant persons, periods of attachments and separation, the child's ability to integrate into a substitute

---

6. The purposes of the Act are set forth as follows:

> Recognizing that the health and safety of children must be of paramount concern and that the right to family integrity is limited by the right of children to be protected from abuse and neglect and recognizing also that uncertainty and instability are possible in extended foster home or institutional living, it is the intent of the Legislature that this chapter:
>
> . . . .
>
> 2. Provide that children will be taken from the custody of their parents only where failure to do so would jeopardize their health or welfare;
>
> 3. Give *family* rehabilitation and reunification priority as a means for protecting the welfare of the children, but prevent needless delay for permanent plans for children when rehabilitation and reunification is not possible;
>
> 4. Promote the early establishment of permanent plans for the care and custody of children who cannot be returned to their *family*.

22 M.R.S.A. § 4003 (1992 & Supp.2000) (emphasis added).

7. The court's grant of intervenor status to the grandparents must have resulted in a judicial finding that such status would be consistent with the purposes of the Act. *See* 22 M.R.S.A. § 4005–B(3). Although the existing permanency plan was, admittedly, established earlier than any potential plan involving placement with the grandparents, such fact does not mean that placement with the grandparents at this point would be inconsistent with the purposes of the Act. The Act seeks early establishment. It does not, however, advocate premature placement or the premature establishment of a permanency plan.

8. Section 4005–B(3) requires the court to grant standing and intervenor status when it finds that the grandparent "has made sufficient effort to establish a relationship with the child, that the status would be in the best interests of the child and that the status would also be consistent with the purposes of this chapter as set forth in section 4003."

placement or back into the parent's home, and the child's physical and emotional needs." *In re Charles G.*, 2001 ME 3, ¶ 14, 763 A.2d at 1168. *See* 22 M.R.S.A. § 4055(2) (Supp.2000).[9]

[¶ 28] Annie is a twenty-two month-old child who has experienced some developmental delays. She has lived with her foster family since she was two days old, and has never known a different home. In contrast, she has visited with her grandparents, perhaps by no fault of the grandparents, for only one hour. She has significantly bonded with her foster mother and has never experienced any substantial period of separation from her. Although she may be able to integrate into a substitute placement with her grandparents, it is not evident that the grandparents have a plan for services to address Annie's special needs. In addition, the record contains some evidence suggesting that Annie's grandfather failed to recognize, at some level, the special needs and developmental delays of his own daughter. The foster family can provide Annie with love, affection, and guidance, and their home provides the stability that she needs now and may need in the future if her special needs further develop. This evidence is sufficient to support the court's finding that it is in Annie's best interests to maintain her present placement, rather than to remove her from the foster home and give priority consideration to placement with the grandparents.

[¶ 29] The trial court acted appropriately in granting the grandparents' intervenor status, promptly ordering a home study, weighing the grandfather's prior demonstrated deficits against Annie's current placement, and concluding that Annie's best interests will be served by placement with her foster parents where her developmental delays are more likely to be recognized and addressed.

[¶ 30] To resolve the priority status issue in the mother's favor, we must determine that the evidence compels a finding that placement with the grandparents is in Annie's best interests. *See Estate of Sylvester v. Benjamin*, 2001 ME 48, ¶ 9, 767 A.2d 297, 300 (party with burden of proof, challenging an adverse factfinding, must demonstrate that a finding in that party's favor is compelled by the evidence) (citation omitted). On this record we find no error because the evidence supports the court's finding that placement with the foster parents was in Annie's best interests. Thus, the grandparents were not entitled to the priority consideration provided in 22 M.R.S.A. § 4005–B(4).

The entry is:

Judgment affirmed.

---

**9.** The result in this case, turning as it must on a determination of what is in Annie's best interests, is not an easy one. The best interests standard "delegates to judges authority to apply their own personal and essentially unreviewable lifestyle preferences to resolving each dispute." *Rideout v. Riendeau*, 2000 ME 198, ¶ 54, 761 A.2d 291, 310 (Alexander, J., dissenting) (citing *Troxel v. Granville*, 530 U.S. 57, 73–74, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)). That standard requires the trial judge to apply specific factors in a highly individualized process that must, by necessity, receive deferential review by an appellate court. *See Daigle v. Daigle*, 609 A.2d 1153, 1154 (Me.1992).