2001 ME 166

**In re KAYLA M.**

Supreme Judicial Court of Maine.

Submitted on Briefs: Sept. 10, 2001.
Decided: Dec. 10, 2001.

John J. Sr., Shapleigh, for appellant.

G. Steven Rowe, Attorney General, Christopher C. Leighton, Asst. Attorney General, Deanna L. White, Asst. Attorney General, Lise Wagner, Asst. Attorney General, Augusta, for appellee.

Donna Bailey, Saco, Guardian ad Litem.

Kathryn Bedell, Ballou & Bedell, York, for mother.

Marc & Denise H., Lebanon, Intervenors.

Panel: WATHEN, C.J.,* CLIFFORD, RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

---

* Wathen, C.J., sat at oral argument and participated in the initial conference, but resigned before this opinion was adopted.

1. The evaluation resolved the unsettled question of sexual abuse; the evaluators concluded *"no* credible evidence exists" to support an allegation of sexual abuse by the father. At

DANA, J.

[¶ 1] The father of Kayla M. appeals from the judgment of the District Court (Springvale, *Wheeler, J.*) terminating his parental rights contending the evidence was insufficient. We affirm the judgment.

## I. BACKGROUND

[¶ 2] In December of 1990, the Department of Human Services (DHS) filed a petition for a child protection order alleging that seven-month-old Kayla was in circumstances of jeopardy to her health or welfare because of her mother's history of mental illness and her father's "history of substance abuse and recent DWI conviction." Shortly thereafter Kayla entered State custody and was placed with the foster family with whom she now resides.

[¶ 3] In January of 1992, DHS questioned whether Kayla had been sexually abused by the father; the father denied the charge and the allegations were later found to be unsubstantiated. Nevertheless, visitation with the father was suspended because of these allegations and Kayla's "energetic[ ] refus[al] to see her father by becoming extremely emotionally upset." Kayla remained with her foster family with the understanding that her therapist would address issues of visitation and reunification between the father and child. The court (Springvale, *Janelle, J.*) in 1995, required the parties to arrange a psychological evaluation of the family system involving Kayla; "the evaluation shall specifically address what the long-term placement plans for this child should be, and the child's reluctance to visit with her parents."[1] The order reiterated that the

the time of the evaluation Kayla was six years of age. The report noted because of the disruption in the relationship with her father, "he is practically a stranger to her now." Kayla was described as "highly anxious" and at risk for emotional and behavioral difficulties. The evaluation tried to explain why

parties should encourage Kayla to visit her father, so long as the interaction was not detrimental to her best interests.

[¶ 4] In April of 1997, the court (Portland, *Wheeler, J.*) indicated that long-term foster care was the permanent plan for Kayla. The order also provided for continued visitation with Kayla's father, amounting to one visit per week. DHS filed the first petition for termination of parental rights in 1998, claiming the father had failed to make a good faith effort to rehabilitate and reunify with Kayla. The court (Biddeford, *Foster, J.*) denied the petition, and decided that while DHS had no reunification obligations it "remained obligated to make contact available" between the father and Kayla (as long as the contact was not detrimental to Kayla's best interests).

[¶ 5] The status quo was maintained[2] until December of 2000 when DHS filed a second petition to terminate parental rights, with the biological mother consenting to the termination. The petition was granted by the court (Springvale, *Wheeler, J.*) in March of 2001. Contending that his relationship with Kayla was prevented by "false allegation[s] not one proven, not one piece of factual evidence," the father, on appeal, challenges the sufficiency of the evidence.

## II. DISCUSSION

[¶ 6] When we review sufficiency challenges, we examine whether the court "could have reasonably been persuaded on the basis of the evidence in the record that the required factual findings were highly probable." *In re Breauna N.*, 1999 ME 191, ¶ 19, 742 A.2d 911, 915. "Deference is paid to that court's superior perspective for evaluating the weight and credibility of the evidence." *In re Leona T.*, 609 A.2d 1157, 1158 (Me.1992).

[¶ 7] A court must first find the State "has met its burden of proving parental unfitness under one of the four prongs of 22 M.R.S.A. § 4055(1)(B)(2)(b)," and only then may the court consider the best interest of the child. *In re Scott S.*, 2001 ME 114, ¶ 19, 775 A.2d 1144, 1150.

### A. Parental Unfitness

[¶ 8] We have recognized that removal from a foster home can constitute "jeopardy" within the meaning of 22 M.R.S.A. § 4055. *See In re Colby E.*, 669 A.2d 151 (Me.1995); *In re Dean A.*, 491 A.2d 572 (Me.1985).[3] The impermanency

---

Kayla "vehemently resisted visitation with her parents ... with extreme emotional behavior." The evaluators concluded that the resistance was a "function of normal levels of anxiety" due to transitions at times of visitation, supported and amplified by the beliefs of the adults surrounding Kayla who thought the father had sexually abused Kayla.

The report stated the father's parenting competence appeared to be "adequate" at the *time, but problems were identified,* "based primarily in his rather self-involved personality style and could lead to some difficulties in the areas of attachment and empathic responsiveness." The evaluation cautioned:

One clear risk for negative emotional outcomes that is likely to ensue upon an effort to *reunify* [is] the disruptive impact of such a move upon Kayla's strong emotional at-

tachment to her foster parents, especially her foster mother. Whatever the historical circumstances, it is [the foster mother] not [the father] who is now in the role of primary psychological parent to Kayla. It will thus be important to weigh any efforts toward reunification against the dangers of disrupting the child's primary attachment relationship.

2. Kayla remained in the same foster home, and the contact with her father was at the discretion of DHS with input from a therapist.

3. The Court affirmed the District Court's order terminating the mother's parental rights, based on the finding that the mother was unable to protect her son from jeopardy "be-

of foster care is to be avoided; permanency and stability are mandated goals. *In re Kafia M.*, 1999 ME 195, ¶ 15, 742 A.2d 919, 925 (citing 22 M.R.S.A. § 4050 (1992): one of the underlying purposes of the Act is to "promote the adoption of children into stable families rather than allowing children to remain in the impermanency of foster care"). When assessing the propriety of terminating parental rights the inquiry is "child specific," meaning though the parent is adequately caring for other children, this does not control the court's decision. *In re Alexander D.*, 1998 ME 207, ¶ 23, 716 A.2d 222, 229. A parent is "unable," within the meaning of section 4055, to protect a child from jeopardy when "that parent is incapable for whatever reason." *In re Colby E.*, 669 A.2d at 152 (quoting *In re John Joseph V.*, 500 A.2d 628, 630 (Me. 1985)).

[¶ 9] Examining the record, we conclude that sufficient evidence was presented to persuade the trial court that it is highly probable that the father is incapable of protecting Kayla from jeopardy and that these circumstances are unlikely to change in a time reasonably calculated to meet Kayla's needs. The evidence includes the testimony of Debra Fredette, a clinical social worker, who facilitated a March 2000 meeting between the father and Kayla.

[¶ 10] During the meeting the interactions became negative when Kayla said, "I want to live with [my foster parents], with my mother and father." The father and Kayla disagreed about an event that happened several years ago, and the meeting deteriorated; Fredette testified that the father began disagreeing with everything Kayla said, interrupting repeatedly. The father became "dissociative . . . [bringing] in pieces of different times and different

events . . . different workers . . . that they had lied." Kayla cried and asked to leave; Fredette testified the father was unable to focus on the present, or the emotional state of his daughter. Though Fredette tried to redirect the father's attention, he remained "transfixed" on the past. Fredette ended the meeting because Kayla was "really crying and wanted to leave." Fredette also emphasized that the father thought the meeting had gone "really well," which supported her sense of the father's disconnection with the reality of what actually happened. Fredette recommended there should be no further contact between Kayla and the father because she "felt like [the father] was emotionally abusive . . . and I didn't feel he had the capacity to understand that." Fredette described Kayla as having "narcissistic tendencies [which develop] if attachments are not really secure for kids, then they can begin to be self-focused [lacking] empathy for others." Fredette concluded Kayla needs "solid grounding . . . and then she would begin to believe that [she] can rely on other people . . . . There is a connection between relying on others and a capacity for empathy." Fredette testified that Kayla has been saying since she was four and a half years old that she did not want to see her father and that Kayla does not have the capacity to form an attachment with her father.

[¶ 11] Donna Bailey, the guardian ad litem, testified after the joint meeting with the father and Fredette, Kayla was "extremely upset . . . it merely cemented in her ·mind what she already believed . . . that her father was not there for her . . . didn't care about her . . . was mean . . . didn't care that she was crying, didn't have sympathy and that she wanted to have

cause the bonding which has developed between Dean and his foster parents makes his removal from the home a threat to his health

and welfare by mental injury or impairment." *In re Dean A.*, 491 A.2d at 574.

**334**

nothing to do with him." Bailey did not think the father was capable of meeting Kayla's emotional needs in the future.

[¶ 12] The evidence fully supports the court's conclusion that the father is unable to respond to Kayla's emotional needs, as evidenced by his complete disconnection to Kayla's distraught emotional state at their last meeting. As the psychological evaluation concluded: "[The father is] focused almost exclusively on his insistence that the child should be with her biological family and is unable to balance Kayla's needs with his own desires."

## B. Best Interests

[¶ 13] The best interest of the child standard pursuant to section 4055(1)(B)(2)(a) is met when there has been significant bonding with the foster mother, the child has not experienced any "substantial period of separation" from the foster mother, and the foster family can give the child "love, affection, and guidance, and their home provides the stability that [the child] needs now and may need in the future...." *In re Annie A.*, 2001 ME 105, ¶ 28, 774 A.2d 378, 386; *see, e.g., In re Charles G.*, 2001 ME 3, ¶ 9, 763 A.2d 1163, 1167 (termination of parental rights is in child's best interest when child, then age twelve, indicated he wished to be adopted by the foster family, foster mother wanted to adopt child, and there was a strong attachment between child and foster family); *In re Serena C.*, 650 A.2d 1343, 1345 (Me.1994) (termination of parental rights

in best interest of child who had difficulty making attachments, who refused to visit biological mother and when did became angry and hyperactive; the child needed the permanence of the foster family).[4]

[¶ 14] Kayla has spent the majority of her life with her foster family. As the guardian ad litem testified, Kayla views her foster parents as her "psychological parents in every sense of that word." She "looks to [the foster parents] for guidance, direction. She clearly looks to Missy, the other girl [the family] adopted, as her sister." Thus, there is sufficient evidence in the record to support the District Court's finding that termination of the father's parental rights is in Kayla's best interest.

The entry is:

Judgment affirmed.

---

4. See also *In re Justin S.*, 595 A.2d 1058, 1060 (Me.1991) (recognizing consideration of the best interest standard included child's insecurity about the future which caused behavioral problems; permanency with the foster family in child's best interest); *In re Hope M.*, 1998 ME 170, ¶ 6, 714 A.2d 152, 154 (holding when child asked if she could be adopted by foster family and evidence that failing to provide the child with permanency through adoption would cause her long-term injury, termination of the father's rights justified regarding the best interest standard); *In re Kafia M.*, 1999 ME 195, ¶ 16, 742 A.2d 919, 925 (recognizing because foster parents wanted to adopt, child had not bonded with biological parents, did not like visiting parents, needed "sustained support" after such visits, and child was "thriving" in foster family household, terminating parental rights was in the best interest of the child).